MEYER BROTHERS DRUG COMPANY v. D. B. KELLEY, B. F. TATUM, SAMUEL WESTHEIMER & CO., THE COMMERCIAL BANK OF GUTHRIE *et al.*

1. TRIAL COURT—*Findings—Will Not Be Disturbed, When.* The rule of *Light v. Canadian County Bank*, 2 Okla. 542, and *The National Bank of Guthrie v. Earl*, 2 Okla. 817, that where evidence has been produced upon all points necessarily included in the findings made by the trial court, if such

evidence reasonably tends to support the findings, such a finding will not be disturbed by this court, and the rule is the same when the case is submitted to the court below without a jury, as when a jury is empanelled to try the cause.

2. CHATTEL MORTGAGE—*Attachment—Priority.* K., a druggist in insolvent circumstances, executed and recorded a mortgage upon a stock of goods for $2,500 to cover an actual indebtedness of $844.66 due appellant, without appellant's knowledge, expecting to receive further advances and credit from appellant, and to secure from appellant a loan for the purpose of paying off a prior mortgage. Upon being informed of the transaction, appellant declined to accept the mortgage for $2,500 in the form and manner in which it had been executed and recorded by K., but undertook to "correct" it by taking from K. a new mortgage for the amount actually due, $844.66, and a note for the same, a part of the arrangement being that it should thereupon execute a release for the $2,500 mortgage. Before the new mortgage could be recorded and contemporaneously with the transactions between K. and the appellant, attaching creditors took the stock of goods of K. The trial court, without a jury, sustained the priority of the attachments as against any right now claimed by appellant under the mortgage for $2,500. *Held:* That this finding and judgment of the trial court was correct and should be sustained.

---

*Error from the District Court of Logan County.*

### STATEMENT OF FACTS.

The defendant, Kelley, was engaged in the drug business in the city of Guthrie, in Logan county, during the year 1889 and up to October 30, 1890, and he was at that date indebted to the appellant company in the sum of $844.66, and to other creditors, the defendants, in various amounts.

On the said date Kelley, of his own motion and without consulting the appellant, made, executed and recorded a mortgage to the appellant upon his entire stock of goods for the sum of $2,500, and executed a note for that amount, payable six months after date. The mortgage was recorded immediately, and the note was taken by him to Kansas City, Mo., where he called upon the

appellant company, exhibited the mortgage, and asked them to accept it as security for the amount, $844.66, due from him, on November 3, 1890.

On November 4, 1890, the stock of goods was seized by the defendants, Samuel Westheimer & Co., by virtue of an attachment issued November 4, 1890, from the district court of Logan county.

A similar attachment was issued and placed in the hands of the sheriff of Logan county on November 6, 1890, in behalf of the defendants, Ferdinand Westheimer & Sons. And on the following day a similar attachment was issued against the defendant, Kelley, for the sum of $1680; and on the — day of November, 1890, the goods were taken possession of by the Commercial bank under and by virtue of a chattel mortgage theretofore executed and recorded in behalf of the said bank. The prior lein of the commercial bank is not contested.

The contest is between the attachment lein of Samuel Westheimer & Co. and the others as against the mortgage for $2,500 executed to the Meyer Brothers' Drug company, without their knowledge, and as is contended by the appellees, without the consent and approval of the appellant company having been obtained either prior to the execution of the chattel mortgage or subsequent thereto.

*Harper S. Cunningham,* for plaintiff in error.

No brief for defendants in error.

The opinion of the court was delivered by

McATEE, J.: While other questions are raised by the pleading, they were abandoned at the trial, and not argued in the brief of appellant, which presents but a

single question which is, the validity of the claim of the appellant company under the evidence in the case, as mortgagee, against the attaching creditors, the appellees, and this validity is conceded to depend upon the question of fact, which is, whether Meyer Brothers' Drug company did, in fact, ever in any manner sanction the mortgage made by Kelley for the sum of $2,500, without their knowledge, and to cover the indebtedness of $844.66.

The case was, on the 12th day of May, 1892, submitted to the court, the intervention of a jury having been waived.

Depositions and oral testimony were introduced on behalf of both plaintiff and defendants, and the cause having been submitted, the issues were found in favor of the appellees.

The motion for a new trial averred that, (1) the court erred in deciding for the defendants and against the plaintiff, and (2) in finding that the twenty-five hundred dollar mortgage given by Kelley to the Meyer Bro. Drug company was not a prior lien to the attachment liens of the defendants, and (3) in refusing to find that Meyer Bros. ratified the twenty-five hundred dollar mortgage to the extent and amount of their claim; and     *

*     (6) in finding that the execution and delivery of the twenty-five hundred dollar mortgage to the register of deeds did not constitute a delivery to the Meyer Bros. Drug Co. within the meaning of the law.

The oral testimony of L. P. Smothers, given in court, showed that he was the adjuster and the collector for the appellant company, and resided in Kansas City, Missouri; that the transaction and conversations which he narrated between Kelley and the appellant company occurred on

November 3, when Kelley came to their place of business at Kansas City, Missouri, and stated to him and to Mr. Schulte, who was general manager of the appellant's business, that "He had executed a mortgage for the sum of twenty-five hundred dollars in favor of the appellant company and had placed it on record."

"And that Mr. Schulte at once told him that it was in excess of what he owed us, and that we could not accept a mortgage for more than the amount owing us; that we could not appear to the public as entering into collusion with any one in any way."    *    *

That,

"We appreciated his voluntary act in securing us, but that the mortgage must be corrected to the proper amount. The plan of correcting it was then brought up, into which I (Smothers) was called more particularly; and I suggested two plans, one of which was to credit on this mortgage note the amount of the excess. The other plan was to execute a new mortgage for the proper amount, and we at once execute a deed of release for the other mortgage," that "the plan of having a new mortgage for the proper amount executed and we executing a deed of release was practicable from the fact that it would put us right before the world. That the other was in fact all right, but it was a contract of which the world had no knowledge. We then discussed Mr. Kelley's plans, etc,, and as to what he wanted to do, in which Kelley stated that his object in making this for such a large sum was that he supposed that he would have to pay off the bank, (Commercial Bank), and that his stock had run down, and that he thought he could induce us to furnish additional stock, stock him up and start him out afresh, etc., to all of which Mr. Schulte declined. This brought us about to closing time, and it was then agreed that I should meet him at his hotel after supper.    *    *    For that reason we consented to transact his business after supper.    According to this arrangement

I went to the Midland Hotel about 8 or 8:30 o'clock. I took with me a blank note and a Kansas form of chattel mortgage, which I knew to conform to this form used in the territory. I then filled out this chattel mortgage and made out this note for $844.66. * * I saw the difficulty of executing it. Hence I told him to sign the note and to take this mortgage back to Guthrie and sign it, and by the next mail I would forward him our deed of release, and he could have them put on record. I took the note and took it to our office and Kelley kept the mortgage. Early the next morning, of the 4th, I went to our attorneys' office and had them draw a deed of release for the twenty-five hundred dollar mortgage, and their notary go with me and take the acknowledgment of our vice president and manager, Mr. Schulte. I meant to mail it in time to catch the early mail to Guthrie. I enclosed it with instructions to take it and the mortgage, recording the deed of release, and then in a few minutes afterwards record the mortgage, having them come in logical order. * *

"On the 6th, I think it was, we received a telegram from Kelley at Wichita, stating that 'Commercial bank closed the store before I got home. What shall I do? Answer here at Hotel Carey. D. B. Kelley.'"

This proved correct and Kelley did not record but retained the new mortgage for the correct amount in his possession.

"Ques. What was said by Schulte to Kelley with reference to accepting it or any portion of that security? Ans. He stated that he appreciated his voluntary act in securing us, and that he could not accept the mortgage for an excessive amount; that we appreciated his act in attempting to secure us. It seemed that Kelley did not know of the fact that giving a mortgage for a greater sum was looked upon with disfavor in the eyes of the law. He didn't know that it was a badge of fraud. It didn't seem to occur to him that he might be putting

himself in a questionable shape.  I believe that is about all except what I have stated in regard to that."

On cross-examination, in reply to the question as to what conversation was had between Mr. Kelley and Mr. Schulte, when Kelley arrived from Guthrie, about the $2,500 mortgage, the witness, Smothers, again said:

"Kelley stated to Mr. Schulte that he had placed a mortgage on record at Guthrie in favor of the Meyer Brothers' Drug company to secure them, stating that the amount of the mortgage was twenty-five hundred dollars. That was about the amount of Mr. Kelley's statement. Mr. Schulte then replied that the house could not accept a mortgage for an amount in excess of what he owed them, and that the mortgage must at once be corrected to the proper amount."

The evidence shows that the witness, Smothers, being the adjuster and collector of the company, was deferred to as to the proper manner in which the mortgage should be changed or "corrected," so that it would be approved of and accepted by the company, and that the company followed his advice and direction.

Under re-cross-examination he was asked:

"Ques. Was it not directed by Mr. Schulte and agreed that you was to take a new mortgage? Ans. It was discussed.  When they came to the question as to how the mortgage should be corrected, then I was called in more directly.  It was referred to me.  They turned to me in cases of that kind, as to how.  I mentioned two plans, one to credit the excess on the twenty-five hundred dollar note.  The other to execute a release.  We decided upon the latter plan from the fact that it placed the whole transaction before the world in its proper light.  Thereupon Mr. Schulte said, 'go ahead and fix it up.' "

The deposition of the witness, Smothers, showed that in the conversation with Kelley:

"Mr. Schulte then replied that the house could not accept a mortgage for an amount in excess of what he owed them, and the mortgage must at once be corrected to the proper amount."

The testimony of Mr. Schulte, by deposition, stated that in a conversation with Kelley, after being informed of the execution of the mortgage for $2,500:

"I told him at once that, as near as I can recollect, his account was between seven and eight hundred dollars, and would necessitate the mortgage being made out to cover that amount and no more, as we had no use for the excess and did not propose to come into collusion, as we were likely to be, in case there was lawing about it; that all we could claim was the amount he owed us and did not propose to be secured for any more. Immediately after that a mortgage simply covering the amount due us was made out and mailed or taken to him, I don't know which, to be recorded there."

"Ques. Do you know whether or not any instrument was executed by Meyer Brothers' Drug company at that time with reference to the first mortgage? Ans. I believe I stated that there was a new mortgage drawn up simply covering our account, and repudiating the other.

"Q. I mean did the Meyer Brothers' Drug company execute any paper? A. I believe there was a paper in the form of a release of the first mortgage drawn."

Upon this testimony and the other testimony introduced, the court, sitting to pass upon the facts and law, found that the contention of the appellant could not be sustained. The court, having heard the evidence below and having passed upon it, we are not justified here in reversing the conclusion to which it came, there having been under its consideration, any evidence tending to support the conclusion at which it arrived. It has been so repeatedly held in this court. (*National Bank of Guthrie v. Earl*, 2 Okla. 617).

But if we could do so, we should, upon a consideration of the whole evidence, sustain the judgment of the lower court.

The mortgage executed by Kelley, upon his own motion, for $2,500 to secure an indebtedness of $844.66, was declared by the manager of the company to be such an act as would "appear to the public as entering into a collusion with the defendant, Kelley," and that "they could not accept the mortgage for more than the amount owing us," and that, "we could not accept the mortgage for an excessive amount," and that, "Kelley did not seem to know that a mortgage for a greater sum was looked upon with disfavor in the eyes of the law," and "a badge of fraud," and that it would be putting himself in a "questionable shape," and that, "the house could not accept a mortgage for an amount in excess of what he owed them, and that the mortgage must at once be corrected to the proper amount."

As between the two plans which were considered by the appellant company for "correcting" the mortgage in question, if the plan had been adopted of remitting the excess immediately upon the note and mortgage for twenty-five hundred dollars and forthwith accepting the security thus altered, we are not called to determine. The appellant company did not accept this course, but took the course of not "accepting the mortgage," because it was "excessive," appeared as a "badge of fraud," was looked upon with "disfavor in the eyes of the law," and was putting the matter in a "questionable shape."

The note for $2,500 was never placed among the bills receivable of the house, where the appellant company always placed notes which they "relied upon as settling the account.    *    *    This note was never treated

in that way." And it was said again by Mr. Schulte, as repeated in the testimony, "the house could not accept the mortgage for an amount in excess of what he owed them."

The mortgage was not, in fact, accepted. It remained uncorrected. It remained, therefore, in a form in which it "could not be accepted," and a method was adopted whereby the appellant company did not undertake to "correct" the mortgage then offered, for an excessive amount, but did, in fact, refuse to accept it, and did adopt another method which was not by "correcting" the mortgage but by taking a second one, which they never succeeded in placing on record, in time to acquire any right prior to that of the attaching creditors, the appellees.

In passing upon this case and upholding the conclusion of the court below, we do but follow the natural promptings of justice in wishing that those who adopt so honorable a course as was chosen by the appellant in this case, might always be successful in the courts.

The judgment of the lower court is affirmed.

All the Justices concurring.